IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| KELVIN LEE MARION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 06-cv-0799-MJR |
| | ) | |
| DARLENE A. VELTRI and | ) | |
| TIMOTHY ADESANYA, | ) | |
| | ) | |
| Defendants. | ) | |

<u>MEMORANDUM and ORDER</u>

REAGAN, District Judge:

A.    <u>Introduction</u>

The Court's March 2009 Order thoroughly summarized the facts and procedural history of this case.  That history need not be repeated in detail here.  Kelvin Lee Marion proceeds on a *Bivens* claim pertaining to the conditions of his former confinement at FCI-Greenville. His July 2007 amended complaint named two Defendants: (1) Darlene Veltri, Warden of FCI-Greenville from January 2003 to February 2005, and (2) Timothy Adesanya, a Physician's Assistant at FCI-Greenville.

Remaining for disposition is Marion's claim that Veltri and Adesanya (Defendants) responded with deliberate indifference to Marion's serious medical need for "soft shoes" between August 9, 2000 and November 17, 2004, thereby violating the Eighth Amendment's prohibition against cruel and unusual punishment.

Now before the Court fully briefed is Defendants' April 23, 2009 motion for summary judgment, with supporting materials filed by Defendants plus a brief in opposition filed by Plaintiff Marion (Docs. 44, 51).

Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FEDERAL RULE OF CIVIL PROCEDURE 56(c). *Accord O'Neal v. City of Chicago*, 2009 WL 3818252, *1 (7th Cir. Nov. 17, 2009); *Dale v. Poston*, 548 F.3d 563, 568-69 (7th Cir. 2008).

In the context of Defendants' motion, the undersigned Judge views the record in the light most favorable to Marion (the nonmoving party) and draws in Marion's favor all reasonable inferences. *Hollins v. City of Milwaukee,* 574 F.3d 822, 826 (7th Cir. 2009), *citing  Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  However, to defeat summary judgment, the nonmoving party (Marion) must do more than raise a metaphysical doubt as to the material facts.  Instead, he "must come forward with specific facts showing that there is a genuine issue for trial." *Keri v. Board of Trustees of Purdue Univ.,* 458 F.3d 620, 628 (7th Cir. 2006), *cert. denied*, 549 U.S. 1210 (2007), *citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

Stated another way, this Court can find a genuine issue of material fact precluding summary judgment "only if sufficient evidence favoring the nonmoving party

exists to permit a jury to return a verdict for that party." *Argyropoulos v. City of Alton*, 539 F.3d 724, 731 (7th Cir. 2008), *quoting Sides v. City of Champaign,* 496 F.3d 820, 826 (7th Cir. 2007), *cert. denied*, 128 S. Ct. 1450 (2008).  Bearing these standards in mind, the Court assesses the record before it, having carefully reviewed the materials submitted by the parties.

B.    Analysis

The Evidence

A preliminary matter bears note.  Defendants rely in part on the affidavit of Dr. Thomas Dawdy, Clinical Director at FCI-Greenville (Doc. 44-3).  Portions of this affidavit appear to be based on Dr. Dawdy's personal knowledge of procedures in the health services unit.  To the extent that Dr. Dawdy relates information *beyond* his personal knowledge, those statements have not been considered.  FED. R. CIV. P. 56(e).

Viewed in Marion's favor, the evidence may be summarized as follows. Marion arrived at FCI-Greenville in August 2000.  He had symptoms of foot discomfort at that time.  A physician's assistant performed a physical examination and noticed that plaintiff had flat feet, a condition in which the arches of the feet have lowered and flattened out. *Dorland's Illustrated Medical Dictionary*, p. 684 (29th ed. 2000).  The examiner also measured Marion's height and weight and assessed obesity.

At FCI-Greenville, individuals working in the laundry are responsible for issuing standard footwear to inmates.  Someone working in the laundry issued standard footwear (boots) to Marion.  The boots had steel toes and were ill-fitting.

On August 14, 2000, Marion sought medical care for his foot ailment. Defendant Adesanya advised Marion to sign up for sick call to discuss his concerns.

Physician's Assistant Adesanya evaluated Marion's foot ailment for the first time on August 22, 2000.  He did not identify flat feet or any other medical problem but determined that Marion's symptoms were caused by ill-fitting shoes.   Adesanya encouraged Marion to obtain proper-fitting shoes.  Marion attempted to do so, without success.  In September 2000, Marion sought medical attention for problems with his feet. Adesanya encouraged him to sign up for sick call.  At some point in 2001, Marion received a new pair of steel-toed shoes.  The new shoes also were ill-fitting.

Adesanya re-evaluated Marion's foot condition on January 6, 2003.  He did not diagnose flat feet but assessed callus and scar tissue on the little toe of the left foot (see Doc. 44-3, ¶ 5).  He agreed to submit a request for soft shoes to a committee and explained the request/approval process to Marion.

On January 8, 2003, Adesanya presented Marion's soft shoe request to members of a medical duty status (MDS) committee.[1]  While Adesanya was authorized to make a recommendation, he lacked authority to approve or reject the request.  When the MDS committee evaluates a soft shoe request, the members typically look for the presence of a sensory problem in the foot or a foot deformity that cannot be accommodated with standard footwear.

---

[1]     Neither of the Defendants herein served on the medical duty status committee.  Dr. Dawdy, the Clinical Director, was in a position to override the committee decision.

The committee reached the conclusion that soft shoes were not medically indicated for Marion's condition.  The record contains no indication that the committee members would have reached a different conclusion had they been informed that Marion had flat feet.

On February 6, 2004, Defendant Veltri responded to Marion's request for an administrative remedy, in which he requested soft shoes.  Veltri denied the request on the basis of information obtained from the health services administrator.  She did not personally assess Marion's medical ailment or his need for treatment in the form of soft shoes.  Rather, she relied on information provided to her by members of the medical staff.

On February 9, 2004, Marion sought a visit with a foot specialist and was advised to sign up for sick call.    On February 23, 2004, Marion's foot condition was re-evaluated by Adesanya, who observed small calluses on the bottom and sides of Marion's feet.  He assessed athlete's foot and prescribed a cream for treatment of that ailment. Adesanya also encouraged Marion to obtain wider shoes from the laundry.

On March 29, 2004, Adesanya reviewed a written request from Marion asking to see a foot doctor.  Adesanya encouraged him to sign up for sick call.

On April 5, 2004, Adesanya re-evaluated Marion's foot condition and assessed athlete's foot and – for the first time – flat feet.  He initiated a consultation with a podiatrist for the purpose of evaluating Marion's foot deformity and encouraged Marion to keep his feet clean and dry.  At some point, Dr. Leone, a staff physician,

approved the referral for a consultative examination.

On April 22, 2004, Adesanya re-evaluated Marion's foot condition and noted a callus on his right little toe, excoriation, and flakes.  He assessed callus and athlete's foot.  Adesanya trimmed the callus, refilled the prescription cream and encouraged Marion to keep his feet clean and dry.  He also verified that a consultation with a podiatrist was pending.

On May 31, 2004, Dr. Dawdy evaluated Marion's foot condition.  He detected thick callus and a thick build-up of tissue.  He trimmed the callus formations, provided instructions for good foot hygiene, and encouraged Marion to keep his appointment with a podiatrist.

On September 17, 2004, a registered nurse evaluated Marion's foot condition.  She assessed thick callus formation and trimmed the calluses.

On June 29, 2006, Adesanya re-evaluated Marion's foot condition, noted his obesity, and assessed plantar fasciitis.  He prescribed pain medication and encouraged Marion to lose weight.

When Adesanya performed his examinations, he assessed the range of motion in Marion's feet and ankles.  He also looked for signs of distress, swelling, bruising, open sores, deformity, fissure, and ulcer.  Adesanya did not form the impression that Marion had a medical condition for which treatment with soft shoes was required. He thought Marion needed wider shoes and that his multiple requests for soft shoes were motivated in part by personal preference.  Adesanya was not responsible for obtaining

properly fitting shoes or scheduling doctor appointments.

On October 17, 2006, Dr. Alan Gitersonke, a podiatrist, evaluated Marion's foot condition.   Dr. Gitersonke found deep nucleated calluses, some of which were assessed as painful and some of which were assessed as very painful.[2]  He debrided all of the lesions on Marion's feet and made the determination that the lesions had been aggravated by wearing steel-toed shoes.  He recommended discontinuing steel-toed shoes and also recommended a soft shoe permit "ASAP." (Doc. No. 44-5, p. 14).

On October 20, 2004, Dr. Dawdy followed Dr. Gitersonke's treatment recommendation.  Marion received soft shoes on November 19, 2004.

<u>Applicable Legal Standards</u>

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court held that the Eighth  Amendment's prohibition against cruel and unusual punishment imposes a duty upon states to provide adequate medical care to inmates.   Failure to provide medical care violates the Eighth Amendment when there is "deliberate indifference" to a substantial risk of harm.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir. 2000).

Deliberate indifference is "more than ordinary lack of due care for the

---

[2]    Dr. Gitersonke's notation of "IPK" appears to be a reference to intractable plantar keratosis, a type of callus formation. **Mark S. Myerson**, *Foot and Ankle Disorders* 390 (Vᴏʟ. 1, 2000). Conservative treatment may include periodic trimming, use of a soft metatarsal support, and change of footwear to a broad, soft shoe. **Michael J. Coughlin**, et al., *Surgery of the Foot and Ankle* 469 (8th ed. 2007).

prisoner's interests or safety." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Instead, the plaintiff must establish that: (1) his medical condition was objectively serious, and (2) the defendants were subjectively aware of the medical need and disregarded an excessive risk to the inmate's health. *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001).

The United States Court of Appeals for the Seventh Circuit has explained it this way. States have an affirmative duty to provide medical care to their inmates. The upshot of this duty is that deliberate indifference to a prisoner's serious medical needs constitutes the unnecessary and wanton infliction of pain, which violates the Eighth Amendment. To demonstrate deliberate indifference, a plaintiff must demonstrate an objectively serious medical condition to which a state official was deliberately, i.e., *subjectively*, indifferent. *Duckworth v. Ahmad*, 532 F.3d 675, 678-79 (7th Cir. 2008). *See also Greeno v. Daly,* 414 F.3d 645, 652-53 (7th Cir. 2005). Furthermore, delays in treating painful non-life-threatening conditions *can* support Eighth Amendment claims. *Johnson v. Doughty*, 433 F.3d 1001, 1017(7th Cir. 2006), *quoting Gutierrez v. Peters*, 111 F.3d 1364, 1371 (7th Cir. 1997).

When considering whether an inmate's medical care demonstrates deliberate indifference to his serious medical needs, the Court looks at the inmate's medical care as a whole. *Gutierrez,* 111 F.3d at 1374. With respect to medical personnel, the Court will infer deliberate indifference if poor treatment decisions

represent a substantial departure from accepted professional judgment.  *Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001).

The Seventh Circuit discussed the latter point last year in *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008), a case in which one of several defendants, a physician's assistant working at the prison, was granted summary judgment on an inmate's *Bivens* claim for deliberate indifference:

> Jackson claims that P.A. Williams violated his Eighth Amendment rights by refusing to treat him following his injury....
>
> [M]edical professionals are not required to provide "proper" medical treatment to prisoners, but rather they must provide medical treatment that reflects "professional judgment, practice, or standards."  *See Sain [v. Wood]*, 512 F.3d 886, 896 (7th Cir. 2008).  There is not one "proper" way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field. *See Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)("[T]he Constitution is not a medical code that mandates specific medical treatment.")....
>
> A medical professional's treatment decisions will be accorded deference "unless no minimally competent professional would have so responded under the circumstances.'"

Deliberate indifference caselaw in this Circuit reveals another principle which guides the Court's determination.   Supervisory officials may not be held liable unless they caused or participated in the alleged constitutional deprivation.  *See, e.g., Chavez v. Cody*, 207 F.3d 901, 906 (7th Cir. 2000).

In *Chavez*, the Court of Appeals affirmed the District Court's dismissal of

one defendant (Sheriff Cady), because the plaintiff had "not shown that he [Cady] had anything to do with these events personally.... In order to be held liable, a supervisor must know about the situation and approve of it. He cannot be liable if he is merely negligent in failing to detect and prevent his subordinates misconduct." *Id. See also Dale,* 548 F.3d at 571 (7th Cir. 2008)(reiterating that the Eighth Amendment "requires more" than negligence to hold correctional officials responsible for deliberate indifference in *Bivens* action).

Although *Chavez* was a § 1983 lawsuit, the same principle applies in *Bivens* actions. "The decisional law is clear that there must be individual participation and involvement by a defendant.... In general, Section 1983 and *Bivens* cases are parallel in this regard." *Del Raine v. Williford*, 32 F.3d 1024, 1047 (7th Cir. 1994). *See also Gossmeyer v. McDonald*, 128 F.3d 481, 494 (7th Cir. 1997)("to state a cause of action under *Bivens*, the plaintiff must allege facts which show that the individual defendant was personally involved in the deprivation of the plaintiff's constitutional rights.").

<u>Liability of Physician's Assistant Adesanya</u>

Adesanya argues that the evidence could not support a finding that he responded to Marion's serious medical needs with reckless behavior. Marion disagrees, pointing out that his foot deformity (flat feet) was initially recognized in August 2000, and Adesanya had authority to prescribe medication to remedy the problem.

While the August 2000 report does reflect that Marion had flat feet, the

Court is not persuaded that the medical assessment supports a finding of deliberate indifference. The only evidence suggesting that Marion had a medical need for soft shoes makes no mention of flat feet (see Doc. No. 44-5, p. 6).

Moreover, the August 2000 report does not support an inference that Adesanya actually *knew* that Marion's foot condition exposed him to a substantial risk of harm. Although Marion suspects that Adesanya could have approved his soft shoe request, that suspicion is not borne out by evidence. Inmate requests for medical footwear are resolved by committee review, with the ultimate decision being made not by Adesanya but by Dr. Dawdy, the Clinical Director.

Finally, the medical record as a whole shows that Adesanya made significant efforts to evaluate and treat Marion's foot ailments. He encouraged Marion to sign up for sick call, performed physical examinations, advised Marion to obtain shoes with a proper fit, encouraged Marion to keep his feet clean and dry, submitted a soft shoe request for committee consideration, prescribed medication, renewed a medication prescription, trimmed calluses, and initiated a referral to a podiatrist for a consultative examination. This evidence does *not* support a finding that Adesanya withheld soft shoes as a gratuitous cruelty. Thus, this case stands in contrast to those involving deliberate or repeated refusal to treat a medical condition, such as prescribing pain medicine to a cancer patient inmate whose blisters prevented him from swallowing and caused him to expectorate blood in *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999).

Marion also points to Adesanya's statement: "I also believe that [Marion] did not like the standard issue boots and wanted to be able to order his own shoes." Marion characterizes this as stereotyping. This evidence suggests that Adesanya may not have given Marion's subjective concerns adequate credence. If Adesanya misjudged the underlying basis for Marion's complaints, he may have been mistaken or perhaps even negligent. But his conduct does not fall far afield of the accepted standard for medical treatment or otherwise qualify as cruel and unusual punishment. In these circumstances, Adesanya is entitled to judgment in his favor.

<u>Liability of Warden Veltri</u>

Defendant Veltri seeks summary judgment in her favor on the basis that she was a supervising official and was not personally involved in making treatment decisions for inmates. She claims she is entitled to rely on information gleaned from medical sources. Marion responds that Veltri's reliance on medical staff was both unreasonable and a dereliction of her duty, noting his multiple requests for medical treatment.

The materials reveal that Veltri reviewed Marion's administrative remedy request, in which he asked for soft shoes and explained that his special order boots hurt him and were damaging his feet. Veltri consulted a health services administrator and learned that the MDS committee had evaluated and denied Marion's request for soft shoes. While Veltri did not grant an administrative remedy, she encouraged Marion to sign up for sick call if he felt that his condition had changed to warrant a soft shoe

permit, so that his condition could be reevaluated by a physician's assistant.

Veltri did not ignore Marion's request.  She investigated his concern and verified that he had access to the medical providers who were qualified to address his problem.  This is not deliberate indifference.  Veltri is entitled to judgment in her favor.

C.      Conclusion

No genuine issues of material fact remain, and Defendants are entitled to judgment as a matter of law.  Accordingly, the Court **GRANTS** Defendants' second motion for summary judgment (Doc. 44) and **DIRECTS** the Clerk of Court to enter judgment in favor of Defendants Veltri and Adesanya, and against Plaintiff Marion.

IT IS SO ORDERED.

DATED November 25, 2009.


s/Michael J. Reagan
Michael J. Reagan
United States District Judge